

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUN 2 3 2010

CLERK, U.S. DISTRICT COURT
By _____
      Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JANIE S. ZAICEK, | § | |
|     PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:09-CV-069-Y |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | |
|     DEFENDANT. | § | |

FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

I. STATEMENT OF THE CASE

The plaintiff, Janie S. Zaicek ("Zaicek"), filed an application for Title II disability insurance

benefits ("DIB") on May 17, 2004, alleging a disability onset date of November 13, 2002.

(Transcript ("Tr.") 30, 77-79.)[1] That application was denied on August 4, 2004 and again on

reconsideration. (Tr. 47, 52.) Zaicek timely requested a hearing before an administrative law judge

---

[1] The relevant time period for Zaicek's application is November 13, 2002, her alleged onset date, through March 31, 2007, her last insured date. (Tr. 30-31.) Thus, Zaicek must establish disability on or before March 31, 2007 in order to be entitled to a period of disability or DIB. See 20 C.F.R. § 404.131.

("ALJ"), and a hearing was held in Fort Worth, Texas before ALJ Ward D. King on September 21, 2006. (Tr. 58, 705-724.)

In her May 2004 application, Zaicek claimed disability due to a number of impairments including fibromyalgia, rheumatoid arthritis, chronic bronchitis, pain, post traumatic stress disorder ("PTSD"), and asthma. (Tr. 89, 718-19.) On February 21, 2007, the ALJ issued a decision finding that she was not disabled. (Tr. 30-43.) The Appeals Council initially denied Zaicek's request for review, then set aside that decision to consider additional information, but ultimately denied her request on November 24, 2008. (Tr. 6-20.) Zaicek subsequently filed the instant action in federal court on January 27, 2009. (doc. #1.)

## II. STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently engaging in substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is not severe if it has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v.*

-2-

*Apfel*, 219 F.3d 378, 392 (5th Cir. 2000).  At the third step, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations.  20 C.F.R. §§ 404.1520(d), 416.920(d).  Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work.  *Id.* §§ 404.1520(e), 416.920(e).  And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience.  *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled.  If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments.  *Crowley,* 197 F.3d at 198; *see also Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir. 1994).  If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested.  *Waters v. Barnhart,* 276 F.3d 716, 718 (5th Cir. 2002).  A denial of benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole.  *Leggett v. Chater,* 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen,* 837 F.2d 1378, 1382 (5th Cir. 1988).  Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion.  *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001).  It is more than a mere scintilla, but less than a preponderance.  *Id.*  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.  *Id.*  This court may

neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000). The Court must, however, carefully scrutinize the record to determine if the evidence is present.

### III. ISSUES

1. Whether the ALJ's residual functional capacity ("RFC") assessment is supported by substantial evidence.

2. Whether the ALJ's determination that Zaicek can perform her past relevant work is supported by substantial evidence; and

3. Whether the ALJ properly assessed Zaicek's credibility.

### IV. ADMINISTRATIVE RECORD

#### A.   Background and Vocational History

Zaicek was born on October 3, 1963. (Tr. 710.) She has a GED diploma. (*Id.*) Her past relevant work was as a data collection/data entry worker for Kaiser Permanente. (Tr. 42, 232, 712-713.) Zaicek had not engaged in substantial gainful activity from November 13, 2002 through the date of the ALJ's decision. (Tr. 31, citing 20 C.F.R. § 404.1520(b).)

#### B.   Relevant Treatment History

From October 2001 through October 2003 Zaicek was treated by Dr. Steve H. Hardee ("Hardee") at Northwest Family Practice in Fort Worth, Texas. (Tr. 217-23.) Hardee diagnosed her with rheumatoid arthritis, chronic left-sided pain, anxiety, and later, malaise and fatigue. (Tr. 218-20.)

Zaicek underwent Magnetic Resonance Imaging ("MRI") in October 2001 at Maxum Diagnostic Center in Fort Worth. (Tr. 222.) Dr. Michael Lanoux ("Lanoux") analyzed the images

-4-

taken of her cervical spine. (*Id.*)  His impressions were that Zaicek had "slight posterior annular bulging" at C5-6, "asymmetric and to the right." (Tr. 221.)  He did not find any neural impingement. (*Id.*)  He also stated that it was otherwise an "essentially unremarkable exam." (Tr. 223.)

Zaicek was referred by Hardee in 2002 for evaluation by Dr. John A. Sklar ("Sklar"), a Diplomate of the American Academy of Physical Medicine and Rehabilitation. (Tr. 210.)  Sklar evaluated her on May 21, 2002 and drafted a letter to Hardee reporting his findings on May 28, 2002. (Tr. 210-12.)  Sklar concluded that the results of Zaicek's physical examination were "consistent with the diagnosis of fibromyalgia." (Tr. 211.)  But he told Hardee that he believed Zaicek's anxiety and depression caused her condition.  (*Id.*)  In his evaluation, he told Hardee that he had communicated to her his belief that fibromyalgia was a stress-related illness. (*Id.*)  Sklar changed Zaicek's medications and stressed the importance of an exercise program as well as counseling. (*Id.*)

Sklar referred Zaicek to the Pain Management Program at Harris Methodist Fort Worth Hospital ("HMFW") for counseling pain management, relaxation training, and biofeedback. (Tr. 198.)  Zaicek was treated at HMFW from June 2002 until January 2003, when she was fired from her job, leaving her without medical insurance to cover the treatments. (Tr. 173-96.)  On January 10, 2003, Sklar discharged Zaicek from the Biofeedback program. (Tr. 173.)  In his assessment of her on that day, he noted that Zaicek had reported moderately reduced joint pain and that her soft tissue pain was mostly relieved, but that she continued to experience panic attacks and anxiety attacks.  (*Id.*)  He found that Zaicek's anxiety and panic attacks seem to be associated with workplace, but that they had significantly decreased since the first session. (*Id.*)  He also noted that Zaicek could benefit from ongoing individual and group counseling. (Tr. 35, 173.)

In 2004, the State Agency referred Zaicek to Dr. Murray Colgin ("Colgin") of the Texas Rehabilitation Commission ("TRC") for evaluation. (Tr. 224-25.) During her evaluation, Zaicek reported that she smoked approximately one pack of cigarettes per day. (Tr. 224.) She also complained of ongoing asthma and bronchitis. (*Id.*) Her physical examination revealed tenderness along her lumbar spine, to the left of her lumbar spine, along either side of her upper thoracic spine, and on her cervical spine. (Tr. 225.) There was no edema in her ankles, but she was very tender there during the examination. (*Id.*) She had normal hand grips and no crepitus or obvious deformity in her hands and wrists. (*Id.*) Colgin noted that Zaicek did not use a cane, and she walked "with a slow, waddling, wide based gait." (*Id.*) He also noted that Zaicek was able to pick up and carry a trash can and was able to use a pen without problems. (*Id.*) He found that Zaicek could hear and speak normally, that her respiratory rate sped up at times during the exam with some "audible wheezing," and that she had a "tobacco smoke odor." (*Id.*)

Zaicek's neurological exam revealed that she seemed to have full strength and that she was symmetrical in all groups, including hand grips. (Tr. 225.) But Colgin noted that Zaicek "seemed to have [an] inordinate amount of pain when [he] checked her reflexes." (*Id.*) In his impressions, Colgin stated that although she had a history of elevated rheumatoid factor, the exam revealed no findings indicative of the condition, nor had she been treated with immunosuppressant drugs. (*Id.*) He also found that Zaicek had fibromyalgia syndrome, noting that she had "diffuse pains," and that she was "very tender to touch in multiple areas." (*Id.*) Finally, he found that she had asthmatic bronchitis. (*Id.*) He commented that she was on inhalers and antihistamine, but not steroid therapy,

and that she still smoked. (*Id.*) He found that her activity level was "primarily limited by the arthralgias and myalgias." (Tr. 225.)

On July 7, 2004, Zaicek underwent a mental status exam. (Tr. 231.) Daniel R. Altman ("Altman"), MS, a doctoral candidate, conducted the exam, and he was supervised by Dr. Raymond F. Finn ("Finn"), a clinical psychologist. (*Id.*) Altman noted that Zaicek appeared "clean and well groomed." (*Id.*) She "appeared nervous at the beginning of the interview, but appeared to relax as the interview progressed." (*Id.*) Altman concluded that Zaicek's "cooperation was enough to yield valid results." (*Id.*)

Altman found that Zaicek appeared to be a reliable informant. (Tr. 231.) He noted that he had reviewed a letter from Sklar as well as two medical forms from an unknown source, which were consistent with the information provided by Zaicek. (*Id.*) Zaicek's chief complaints were anxiety and depression. (*Id.*) She reported that she had been raped by a family member and two close family friends between the ages of 10 and 12. (*Id.*) She said she had experienced problems with anxiety and depression since early adolescence. (*Id.*) She reported that she had difficulty at family gatherings and frequently became anxious around strangers. (Tr. 231.) She also reported that her first husband had been severely physically abusive. (*Id.*) She told Altman that she had been injured in an automobile accident nine years before, and that she had experienced pain in her left arm, leg, and back since the accident. (Tr. 232.)

Altman found no problems with Zaicek's thought process, nor did she have perceptual abnormalities. (*Id.*) He said her "affect was anxious and sad." (*Id.*) She did not have problems with sensorium and cognition or memory. (*Id.*) He noted that she was "mildly distractible," but that she

-7-

could count down from 20 and spell the word "world" both backward and forward without difficulty. (Tr. 233.) He assessed that her "judgment appeared somewhat inadequate," based on certain life decisions she had made, but that her "insight appeared adequate." (*Id.*)

Altman's supervisor, Finn, diagnosed Zaicek with Major Depressive Disorder ("MDD"), recurrent, moderate, and chronic, and also with PTSD. (Tr. 234.) He said that her prognosis was "good," noting that Zaicek was capable of controlling certain aspects of her mental conditions with stress management techniques. (*Id.*) Finn recommended that she participate in individual psychotherapy, and that she should be re-evaluated for employment potential after receiving therapy. (*Id.*) He found that she would "likely have difficulty working," until her psychological symptoms were treated in individual psychotherapy. (*Id.*) Finn assessed Zaicek a global assessment of functioning ("GAF") score of 55.[2]

On August 4, 2004, Zaicek was examined by Dr. John Johnson ("Johnson") regarding her complaints of urinary incontinence. (Tr. 444-45.) On August 30, 2004, Johnson noted that her incontinence appeared to have improved with medication. (Tr. 450.) He recommended that she restart Detrol, which appeared to have helped her, and that she void by the clock every 2-3 hours during the day and that she double-void to insure complete bladder emptying. (*Id.*)

Almost a year later, in June 2005, Zaicek's primary care physician, P. Daniel Gonzalez ("Gonzalez") at the Healthfirst Medical Group in Azle, Texas drafted a letter stating that Zaicek was currently being treated at the clinic and that she had been diagnosed with urinary incontinence,

---

[2] The American Psychiatric Association defines an individual whose GAF is between 51 and 60 as one who has "Moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g. few friends, conflicts with peers or coworkers)." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (4th Ed., 2000) at 34.

chronic back pain, fibromyalgia, TMJ, asthma, depression, cervical spondylosis, and possibly rheumatoid arthritis. (Tr. 311.) He said she was on "multiple medications, including pain medications, muscle relaxers, anti-depressants, and bladder medications." (*Id.*) He explained that although she had received epidural injections and trigger point injections to help relieve her pain and reduce inflammation that the procedures were unsuccessful. (*Id.*) He said Zaicek could not ambulate more than 25 feet without needing to rest and that she could not drive a vehicle because of the multiple pain medications she was taking. (*Id.*) Gonzalez stated that Zaicek was "unable to work at present," and noted that the clinic was making an appointment for her to be seen by a neurologist and that they would follow up on her progress. (*Id.*)

Gonzalez referred Zaicek to Dr. Ashley Classen ("Classen"), a pain management specialist. Classen first examined Zaicek on June 13, 2005. (Tr. 349.) In December of that year, Classen sent a letter to Gonzalez explaining that the multiple treatments she had given Zaicek had not provided any significant relief and that she had no other treatment options to offer her. (Tr. 334.) She said that Zaicek had been evaluated by Dr. Edward Kramer to determine candidacy for Accu-Spina therapy, and that she had undergone the treatment. But Kramer recommended that Zaicek "undergo a neuropsychological evaluation, due to the possibility that [Zaicek was] suffering from a somatoform disorder versus Munchausen's syndrome versus malingering." (*Id.*) Classen stated that after evaluating Zaicek, the Martin Center for Chronic Pain Management at Baylor All Saints recommended that she "pursue individual treatments of counseling with the psychologist, individualized occupational therapy, and biofeedback training with a psychologist." (*Id.*) They also recommended that Zaicek "would benefit greatly from a referral to a psychiatrist." (*Id.*)

-9-

Zaicek returned to Classen's office on August 21, 2006, after being referred by her primary care physician due to continued extreme neck pain. (Tr. 632.) Classen noted that Zaicek was "highly emotional" and that she had expressed suicidal thoughts. (*Id.*) Classen recommended inpatient care due to Zaicek's "recurring thoughts of harming herself and others." (*Id.*)

On November 17, 2006, Classen again examined Zaicek. (Tr. 631.) She noted that Zaicek was well-nourished, did not appear to be in distress, and that she had normal breath sounds and a normal heart rate. (*Id.*) Classen noted that Zaicek experienced pain in her neck and shoulders, that she had limited active range of motion, but that she was at full strength. (*Id.*) Her assessment listed diagnoses of cervicalgia, cervicobrachial syndrome and cervical spondylosis. (*Id.*)

Later that month, on November 27, 2006, Zaicek underwent trigger point injections. (Tr. 617-18.) At least 24 hours following her treatment, Zaicek described her pain as "mild." (Tr. 618.) Zaicek continued to undergo trigger point therapy. Following treatments on December 11 and 27, 2006, February 7, 14, and 20, 2007, Zaicek described her pain as either "mild," or in most cases, "minimal." (Tr. 533-606.)

On January 4, 2008, following the expiration of Zaicek's insured period for purposes of DIB, she was evaluated by Dr. George Mount ("Mount"), a clinical psychologist. (Tr. 421-23.) He determined that her responses to his evaluation "suggest[ed] severe somatic distress, severe anxiety and associated symptoms, and severe depression." (Tr. 421-23.) He concluded that Zaicek's "symptoms in all three of these areas are likely to interfere significantly with the progress and outcome of physical treatment." (Tr. 423.)

-10-

That same day, Mount administered the Millon Clinical Multiaxial Inventory-III. (Tr. 428-37.) In a Mental Residual Functional Capacity Questionnaire, Mount listed his clinical findings as depression, chronic pain, and PTSD. (Tr. 437.) In evaluating Zaicek's "mental abilities and aptitudes needed to do unskilled work," Mount assessed her abilities as "limited but satisfactory" in five areas, and "seriously limited, but not precluded" in seven areas. (Tr. 439.) He also found that she was "unable to meet competitive standards" in five areas. (*Id.*) Mount opined that Zaicek's impairments or treatment would cause her to be absent from work more than four days per month. (Tr. 441.) He also found that she was not a malingerer. (*Id.*) He diagnosed her with depression, chronic pain, and PTSD. (Tr. 437.) Mount stated that Zaicek's prognosis was "guarded," and he assessed a GAF of 45-50.[3]   (*Id.*)

C.      Administrative Hearing

At her hearing before the ALJ, Zaicek waived her right to representation, and her mother and sister-in-law testified on her behalf. (Tr. 30, 707-725.) Zaicek testified that she last worked at Kaiser Permanente in 2002 in a data collection and entry position. (Tr. 32, 711.) She said she had been transferred to that position from a customer service position due to her fibromyalgia, since data entry was physically less stressful. (*Id.*) But she said that data entry was more mentally stressful. (*Id.*) She testified that she was fired from that position, and that her supervisor simply told her "I just don't think I can take you anymore." (Tr. 32, 716.) Zaicek also testified that she had worked

---

[3]   The American Psychiatric Association defines an individual whose GAF is between 41 and 50 as one who has "Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable TO KEEP A JOB)." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (4th Ed., 2000) at 34.

full time for a cab company in accounts receivable and that she had also worked as an administrative assistant, a bookkeeper and an office clerk. (Tr. 32, 711-14.)

Zaicek testified that she'd been diagnosed with fibromyalgia five years prior to the hearing, and that she'd been diagnosed with depression eight years before. (Tr. 32, 714.) She also testified that she had experienced problems with urinary incontinence. (Tr. 32, 715-16.) She said she was unable to work for more than a few minutes at a time due to her anxiety, depression, and fibromyalgia. (Tr. 32, 714-15.) Zaicek said the fibromyalgia caused painful muscle spasms when she sat for long periods of time, that it prohibited her from standing for long or from lifting anything, and that it made her handwriting shaky. (Tr. 32, 716-17.) She said she dropped things, that she had numbness in all of her extremities, and that she had pain down into her left leg. (*Id.*) She said there was no cure for her fibromyalgia, but that she did try to meditate and use self-hypnosis and biofeedback techniques she had learned to help deal with the pain. (Tr. 32, 719.) She testified that she mostly stayed in bed, and that she had a tremendous fear of new doctors. (Tr 33, 719.) Zaicek also testified that she'd been beaten by an abusive ex-husband, and that she had sustained a neck injury from one of the beatings 18 years ago. (Tr. 32, 717.)

Zaicek's sister-in-law, Julie Burke ("Burke"), testified that she had personally witnessed the symptoms of Zaicek's depression, such as staying in bed all day, crying, and spending hours laying on the grave of a pet that had died two years before. (Tr. 33, 720.)

Zaicek's mother, Jane Rowland ("Rowland"), testified that she had worked with Zaicek at Kaiser Permanente and had witnessed Zaicek having panic attacks at work. (Tr. 33, 721.) She also said that many mornings she had to help Zaicek out of both the bed and the bathtub. (Tr. 721.) She

testified that Zaicek could not drive and had not driven for two or three years due to the medication she took. (Tr. 33, 722.)

> D. The ALJ's Decision

In entering his decision, the ALJ performed the five-step sequential evaluation process for determining whether a person is disabled. (Tr. 30-43); 20 C.F.R. § 416.920(b). At step one, the ALJ found that Zaicek was fully insured from the time she alleged her disability began through March 31, 2007. (Tr. 31.) He also found that she had not engaged in substantial gainful activity since November 13, 2002. (*Id.*, citing 20 C.F.R. § 416.1520(b).)

At step two, the ALJ determined as follows:

[Zaicek] has the following impairments: fibromyalgia, major depression, anxiety attacks, post-traumatic stress syndrome, a slight bulging disc at C5-6 of her cervical spine, asthma, fatigue, urinary frequency, cervicalgia, migraine headaches, and cervicobrachial syndrome. She has a 'severe' combination of impairments[.] (*See* 20 C.F.R. § 416.920(c)).

(Tr. 31.)[4]

The ALJ continued to step three, finding that Zaicek did not have an impairment or combination of impairments that met or equaled a listing at step three of the disability analysis. (Tr.31, citing 20 C.F.R. Part 404, Subpart P, Appendix 1; §§ 404.1520(d), 404.1525 and 404.1526). The ALJ stated that he had considered the opinions of the State Agency medical consultants who reached the same conclusion when they evaluated Zaicek's impairments at the initial and

---

[4] In her brief, Zaicek notes, without further argument, that the ALJ did not cite to *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1999) setting forth the proper severity standard. (Pl. Br. at 16-17.) But she does not argue that she suffered any prejudice as a result of the ALJ's failure to cite the *Stone* opinion, nor does she argue that the ALJ failed to recognize that she has any certain impairment. Thus remand is not proper on this basis because there is no demonstration that the substantial rights of a party have been affected. *See, e.g., Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) ("Procedural perfection in administrative proceedings is not required.")

reconsideration levels of the administrative review process. (Tr. 31.) He indicated that he had given

those opinions significant weight because they were "well supported by and very consistent with the

remaining credible medical evidence, particularly the objective medical evidence." (Tr. 31-32.)

The ALJ then formulated a RFC for Zaicek as follows:

> [Zaicek] retains the residual functioning capacity to lift and carry 50 pounds occasionally and
> 25 pounds frequently, and to sit, stand, and walk (individually or in combination) throughout
> an 8-hour workday; she is limited to jobs with a reasoning development level of 1-3 (as
> defined in the *Dictionary of Occupational Titles*), and she can have no more than superficial
> contact with the public; she has no other limitations. [Zaicek] can obtain, perform, and
> maintain a limited range of medium work as described on a sustained, full-time basis and
> maintain employment for an indefinite period of time[.] (*See Watson v. Barnhart*, 288 F.3d
> 212 (5th Cir. 2002) and *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).

(Tr. 32.) After determining Zaicek's RFC, the ALJ set forth nearly ten pages of single-paged text

analyzing the evidence he considered before proceeding to step four of the analysis. (Tr. 32-41.)

At step four, the ALJ found that Zaicek was "capable of performing her past relevant work

as a data collection/data entry worker, as she performed it and as it is generally performed in the

national economy." (Tr. 41.) He also found that such work would not require Zaicek to perform

work-related activities precluded by her RFC. (*Id.*, citing 20 C.F.R. § 404.1565.) Ultimately, the

ALJ concluded that Zaicek was not disabled within the meaning of the Act at any time from the

alleged date of onset through the date of the decision. (Tr. at 42.)

## V. DISCUSSION

A.      Whether the ALJ's RFC assessment is supported by substantial evidence.

Zaicek first asserts that the Commissioner's decision is not supported by substantial evidence

because the ALJ failed to consider the vocational significance of all of her severe impairments.

(Plaintiff's Brief ("Pl. Br.") at 16-21.) Zaicek does not claim that the ALJ failed to identify any of her severe impairments. (*See id.*) Instead, she argues that while he considered the effects of her fibromyalgia and depression, he nevertheless failed to consider the effects of her urinary frequency, asthma, migraine headaches, anxiety attacks, and PTSD on her ability to function. (*Id.*)

The responsibility for determining a claimant's RFC lies with the ALJ. *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th. Cir. 1990). After setting forth his analysis of Zaicek's severe impairments and their impact on her functional ability to work, the ALJ formulated an RFC which took into account her physical and mental limitations in light of the evidence in the record. As for her mental limitations, the ALJ limited Zaicek to jobs with a reasoning level of 1-3 and also limited her to positions where she would have no more than superficial contact with the public. (Tr. 42.) He specifically noted that she could not to return to her previous job as a customer service representative because she was restricted regarding contact with the public. (*Id.*) And he noted that she could not perform her previous positions as a clerk or bookkeeper because the *Dictionary of Occupational Titles* classifies those jobs with a reasoning development of 4. (*Id.*) There is substantial evidence in the record supporting his determination.

As for Zaicek's allegations of limitations stemming from her migraine headaches, the record shows that she had normal brain scan results, and her treating physician, Gonzalez, made no mention of limitations caused by her headaches. (Tr. 311, 323.) Nor is there any evidence in the record of limitations stemming from migraine headaches.

Zaicek also argues ALJ should have provided limitations for her asthma. (Tr. 32.) The record is clear, however, that Zaicek smoked a pack of cigarettes a day for 30 years. (Pl. Br. at 18;

-15-

Tr. 224.)   Zaicek's chest x-rays revealed normal results, and various physicians noted clear respiratory sounds and normal breathing. (*See, e.g.*, Tr. 228, 280, 512, 631, 688.)   The record also reflects that Zaicek had experienced symptoms of asthma for years, yet she had worked for much of that time. (Tr. 32, 224.)   Thus, the ALJ properly discounted her allegations regarding her asthma. *See Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (holding that the ability to work with a pre-existing condition is evidence that the condition is not disabling); *see also Fraga v. Bowen*, 810 F.2d 1296, 1305 (5th Cir. 1987) (same).

There is likewise substantial evidence in the record to support the ALJ's choice not to include a limitation for Zaicek's urinary incontinence. (Pl. Br. at 18.) Zaicek's urologist, her primary care physician, and Zaicek herself found that when Zaicek took medication, performed Kegel exercises, and voided by the clock that her symptoms were managable. (Tr. 443, 450.)   Moreover, the record demonstrates a two year gap in Zaicek's treatment history for urinary incontinence. (Tr. 450.)   Thus the ALJ correctly did not include limitations for a condition controllable with medication. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988) ("If an impairment reasonably can be remedied or controlled by medication or therapy, it cannot serve as a basis for a finding of disability.")

Finally, Zaicek asserts that the records submitted to the Appeals Counsel, which included Mount's initial evaluation and assessment, were not before the ALJ and therefore provide a basis to alter his RFC determination. (Pl. Br. at 18-19; Tr. 6-8.) Mount's evaluation and assessment, however, was issued in January 2008, more than nine months after the expiration of Zaicek's insured status. (Tr. 423-436.)   Thus the Appeals Counsel correctly concluded that the evidence did not provide a basis for altering the ALJ's decision. (Tr. 6-8.); *See Torres v. Shalala*, 48 F.3d 887, 894

-16-

n. 12 (5th Cir. 1995) (holding that evidence demonstrating degeneration of an appellant's condition after the expiration of his insured date was not relevant.)

Additionally, the Court agrees with the Commissioner that the Appeals Council properly determined that the remainder of the additional evidence submitted by Zaicek following her hearing before the ALJ was not material and would not have changed the ALJ's disability determination. (Defendant's Brief ("Def. Br.") at 14-15); *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994) (holding that new evidence is only material if there is a reasonable possibility that it would have changed the outcome of the Commissioner's determination) (citations omitted). The evidence to which Zaicek refers pertains to the trigger point therapy Zaicek underwent under Classen's supervision. (*See* Tr. 533-606.) But as the Court previously set forth, following each of her treatments from December 2006 through February 2007, Zaicek reported that her pain was either "mild," or in most cases, "minimal." (*See id.*) Thus, the evidence demonstrates that her condition was well-controlled when properly treated and cannot provide a basis for a finding of disability. *See, e.g.*, *Johnson*, 864 F.2d at 348.

Zaicek also argues that the ALJ failed to give full credit to the State Agency psychological consultant's mental RFC assessment, which indicated Zaicek was moderately limited in her ability to perform various work activities. (Pl. Br. at 19-20; Tr. 246-47.) An ALJ is ultimately responsible for determining a claimant's RFC. *See Villa*, 895 F.2d at 1023. But the ALJ must consider and weigh all medical opinions in the record, even opinions on issues like RFC that are reserved to the Commissioner. *Price v. Astrue*, 572 F.Supp.2d 703, 710 (N.D. Tex. 2008); 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). Here, the ALJ's decision clearly indicates that he considered the

-17-

opinions of the State Agency medical consultants. (Tr. 32-33, 39-40.) He found that their opinions were "credible and consistent with the medical record before them at the time those decisions were made." (Tr. 40.) But the State Agency physicians rendered their opinions in 2004, without having the opportunity to review Zaicek's complete medical record. (Tr. 32, 40, 246-68.) And the ALJ determined that the complete record demonstrated that Zaicek did not have the additional limitations cited by the State Agency psychological consultants. (Tr. 32, 246-48.). The Court finds that there is substantial evidence to support the ALJ's determination.

Zaicek also argues that the Commissioner failed to fully evaluate her possible somatoform disorder noted by Mount in his evaluation. (*See* Pl. Br. at 19-20.) As discussed previously, however, Mount's evaluation was only completed after Zaicek's insured status expired, and he only indicated that she had a "possible" somatoform disorder. (Tr. 429, 439, 441.) And there is insufficient evidence in the record from the relevant time period regarding any such disorder. Thus, the ALJ did not err in failing to consider it.

Finally, Zaicek argues that "she has been prejudiced by the Commissioner's failure to consider all of her vocationally significant impairments." (Pl. Br. at 20.) She claims that if the ALJ had fully developed the record, additional evidence would have been produced that might have led to a different decision. (*Id.*, citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (citations omitted).) Zaicek argues that the Commissioner should have more fully developed the record regarding her possible somatoform disorder. (*Id.*) Mount's assessment, however, was made after Zaicek's insured status expired. (Tr. 429, 439-441.) And there is no other evidence in the record

-18-

from the relevant time period warranting further development of the record. Zaicek has not demonstrated prejudice as a result of the ALJ's alleged failure to develop the record.

B.   Whether the ALJ's determination that Zaicek can perform her previous work is supported by substantial evidence.

Zaicek next argues that the ALJ's determination that she can perform her past work as a data collection/entry clerk is not supported by substantial evidence. (Pl. Br. at 20-23.) In coming to his decision, the ALJ first considered whether Zaicek could perform her past work as a customer service representative and found that she could not because she was restricted to no more than superficial contact with the public. (Tr. 42.) He then found that she could not perform her past work as an administrative clerk or as a bookkeeper because the Dictionary of Occupational Titles ("DOT") classified those jobs with a reasoning level of 4, whereas Zaicek was restricted to jobs with a reasoning level of 3. (*Id.*)

In his decision, the ALJ noted that the DOT "classifies data entry clerk jobs as sedentary work with a reasoning development level of 3, as generally performed in the national economy." (Tr. 42, citing U.S. Dep't of Labor, *Dictionary of Occupational Titles* no. 203.582-054 (4th ed., rev. 1991).) The Department of Labor promulgated the DOT in order to "standardize occupational information in support of job placement activities." U.S. Dep't of Labor, *Dictionary of Occupational Titles* at xv (4th ed., rev. 1991). Thousands of jobs are classified within the DOT based on a number of factors, such as the amount of time required for a typical worker to learn the techniques, information, and facility required for average performance of a specific job. *Dikeman v. Halter*, 245 F.3d 1182, 1186, n. 2 (10th Cir. 2001); *Sutton v. Astrue*, 2010 WL 1685813, at *4 (N.D. Tex. April 2, 2010).

-19-

Jobs with a reasoning level of 3 require an individual to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form," and to "[d]eal with problems involving several concrete variables in or from standardized situations." U.S. Dep't of Labor, *Dictionary of Occupational Titles*, § 203.582-054 (4th ed., rev. 1991). Zaicek argues that jobs with a reasoning level of 3 are "inconsistent with a limitation for simple and routine work tasks." (Pl. 21-22, citing *Hackett v. Barnhart*, 395 F.3d 1168 (10th Cir. 2005).) But the ALJ did not limit Zaicek to jobs with simple and routine work tasks. Rather, he limited her to jobs with a reasoning level of three. (Tr. 42.) Thus, any conflict between that reasoning level and simple and routine work tasks is irrelevant.

Zaicek claims that the ALJ's conclusion that she could perform a job with a reasoning level of 3 was inconsistent with the findings of the State Agency consultant. (Pl. Br. at 21-22.) As discussed previously, however, the ALJ was not required to accept the findings of the State Agency psychological consultants. Rather, he was entitled to formulate an RFC for Zaicek based on the record as a whole. (Tr. 32-41.) And the record contains substantial evidence to support his determination. For example, Altman rated Zaicek as possessing average intelligence and good memory, able to relate information in a quiet, friendly and reserved manner, and only mildly distractible with respect to her ability to concentrate. (Tr. 37, 231, 233.)

Finally, Zaicek argues that the ALJ determined that she could interact with co-workers based solely on her "ability to interact well with her family and to maintain a relationship with a friend on the internet." (Pl. Br. at 22.) But that is not an accurate depiction of the ALJ's analysis. He considered Zaicek's history of sexual assault and fear and anxiety of strangers in restricting her to

no more than superficial contact with the public. (Tr. 37.) But, in light of her positive interaction with her family, her friend over the internet, and her good rapport with her consultative physicians and treating resources, he found that she was able to interact adequately with coworkers and supervisors. (Tr. 37-38.) The Court finds that the ALJ's determination that Zaicek could perform her past relevant work as a data collection/entry clerk is supported by substantial evidence. (Tr. 41-42.)

> C.    Whether the ALJ Properly Evaluated Zaicek's Credibility.

Zaicek's final argument is that the ALJ failed to properly evaluate her credibility. (Pl. Br. at 23-25.) She complains, *inter alia*, that the ALJ inappropriately rejected her credibility for failure to demonstrate objective evidence, even though the Commissioner has recognized that there are few objective findings in the presence of fibromyalgia. (Pl. Br. at 23-24, citing SSA instruction AO-002-00-OD(DI).)

An ALJ is not required to give subjective evidence precedence over objective evidence. *See Hollis v. Bowen*, 837 F.2d 1378, 1385 (5th Cir. 1988) (citations omitted). Rather, the ALJ's evaluation of the credibility of an individual's complaints of pain is used to resolve conflicts between the subjective evidence and the medical evidence. *Id.* The record is clear that the ALJ considered a number of factors, including inconsistencies in the medical evidence, Zaicek's daily activities, her course of treatment, and her testimony at her hearing in determining that her subjective complaints were not credible to the extent she claimed. (Tr. 32-41.) Thus, he clearly indicated the credibility choices he made and the basis he used for making those choices. *See Hollis*, 837 F.2d at 1385; *see also* 20 C.F.R. § 404.1529 (ALJ will consider the extent to which claimant's symptoms can

reasonably be accepted as consistent with the objective medical evidence and other evidence); Social Security Ruling 96-7p (discussing factors used in credibility determination).

Zaicek complains that even though the ALJ did not question her diagnosis of fibromyalgia, he discredited her subjective complaints related to that impairment. (Pl. Br. at 23; Tr. 33.) In *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983), the Fifth Circuit Court of Appeals held that "[t]he mere presence of an impairment is not disabling per se." In *Heckler*, the Court of Appeals noted that the Secretary did not find that the claimant did not have an impairment, but rather that "the degree of impairment evidenced by the objective medical finding did not impose functional restrictions of disabling severity on [her] activities." *Id.* This is precisely the situation in the instant case. The ALJ did not find that Zaicek did not have fibromyalgia; in fact he acknowledged that she might have some pain associated with that condition. (Tr. 31-41.) Rather, the ALJ found that the medical evidence showed that Zaicek's fibromyalgia was not totally disabling. (Tr. 31-42.) And there is substantial evidence in the record to support his choice to credit the medical records over Zaicek's subjective testimony, including multiple physical examinations that revealed normal systems, normal range of motion, normal reflexes, good grip strength and lack of tenderness in her back and extremities. (Tr. 211, 225, 275, 277-80, 295, 297, 305, 307, 312, 317, 351, 444, 450, 519, 631-32.)

Zaicek also argues that consultative examinations are not likely to produce relevant findings in fibromyalgia cases. (Pl. Br. at 23-24, citing SSA instruction AO-002-00-OD(DI.).) But the ALJ also considered the findings of Zaicek's treating physicians, who regularly noted that her systems

were largely normal, with occasional back spasms or adenopathy in her neck. (Pl. Br. at 23; *cf.*Tr.

39, 275, 277-80, 295, 297, 305, 307-08, 312, 317, 351, 444, 450, 519, 631-32.)

Additionally, the ALJ considered Zaicek's daily activities, noting that she performed light

housework and light yard work, watched television, read the newspaper, and helped her mother's

boyfriend run errands. (Tr. 37, 200, 232.) And a medical report dated December 10, 2007 indicated

that Zaicek exercised for half an hour on a daily basis. (Tr. 694.) Thus the ALJ's determination that

Zaicek's daily activities discredited her allegations of disabling impairments is supported by

substantial evidence. *See, e.g.*, *Anthony v. Sullivan*, 954 F.2d 289, 296 (5th Cir. 1992) (noting that

the claimant engaged in a variety of activities, including bathing herself, preparing food, and

operating a vehicle).

Finally, Zaicek argues that the ALJ erred in not providing specific reasons for his

determinations that the testimony of Burke and Rowland was not credible. (Pl. Br. at 24.) The

record is clear that the ALJ discredited their testimony for the same reasons he discredited the

testimony of Zaicek, because the allegations of her limitations were inconsistent with other evidence

in the record. (Tr. 33.) The ALJ did not err in failing to provide specific reasons for choosing to

discredit the testimony of Burke and Rowland. *See, e.g.*, *White v. Astrue*, 2009 WL 763064, at *12

(N.D. Tex. Mar. 23, 2009) (finding that substantial evidence supported the ALJ's findings with

regard to the complainant's credibility and her RFC during the closed period for which she sought

benefits).

Zaicek has failed to meet her burden of proof in the first four steps of the sequential

evaluation process. *Crowley*, 197 F.3d at 198; *see also Greenspan*, 38 F.3d at 236. She has failed

-23-

to show she was unable to perform her past relevant work during the relevant time period on a sustained basis. An ALJ's decision is not subject to reversal, even if there is substantial evidence in the record that would have supported the opposite conclusion, so long as substantial evidence also supports the conclusion that was reached by the ALJ. *Dollins v. Astrue*, 2009 WL 1542466, at *5 (N.D. Tex. June 2, 2009) (citations omitted). The ALJ's determination that Zaicek was capable of performing her past relevant work on a sustained basis is supported by substantial evidence.

RECOMMENDATION

For the foregoing reasons, the Court recommends that the Commissioner's decision be affirmed.

NOTICE OF RIGHT TO OBJECT TO PROPOSED<br>FINDINGS, CONCLUSIONS AND RECOMMENDATION<br>AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until July 14, 2010. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file, by the date stated above, a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or

manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until July 14, 2010 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

**SO ORDERED.**

**JUNE 23, 2010**

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE